**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| ANGELA CRABTREE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:18CV466 |
| | ) | |
| ANDREW M. SAUL, | ) | |
| Commissioner of Social Security,[1] | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

Plaintiff, Angela Crabtree, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 7 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 11, 13; see also Docket Entry 12 (Plaintiff's Memorandum); Docket Entry 14 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] The United States Senate confirmed Andrew M. Saul as the Commissioner of Social Security on June 4, 2019, and he took the oath of office on June 17, 2019. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Andrew M. Saul is substituted for Nancy A. Berryhill as the Defendant in this suit. Neither the Court nor the parties need take any further action to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

# I.  PROCEDURAL HISTORY

Plaintiff applied for SSI.  (Tr. 219-25.)  Upon denial of that application initially (Tr. 110-19, 131-34) and on reconsideration (Tr. 120-30, 141-50), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 151-53).  At the hearing, which Plaintiff, her attorney, and a vocational expert ("VE") attended (Tr. 42-72), the ALJ determined that, in order to fully develop the record, he needed to consult a medical expert ("ME") in the field of cardiology, send Plaintiff to a consultative psychological examination to gauge her cognitive symptoms, and convene a supplemental hearing (see Tr. 69-70).  Plaintiff, her attorney, a VE, and an ME attended the supplemental hearing.  (Tr. 73-109).  The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act.  (Tr. 8-30.)  The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-7, 217-18, 354-56), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1.   [Plaintiff] has not engaged in substantial gainful activity since September 26, 2013, the application date.
>
> . . .
>
> 2.   [Plaintiff] has the severe impairments of postural orthostatic tachycardia syndrome (POTS), chronic fatigue syndrome (CFS), and depression.
>
> . . .

3.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

4.   . . . [Plaintiff] has the residual functional capacity to perform work at the light exertional level who can stand and/or walk for up to a total of [four] hours in an [eight-]hour workday, and can sit for up to a total of [six] hours in an [eight]-hour workday.  She can perform goal-oriented rather than production oriented work (e.g., the performance of work tasks in allotted time is more important than the pace at which the work tasks are performed).  She can never climb ladders, ropes, or scaffolds; can occasionally balance and stoop. She can have occasional exposure to moving mechanical parts and high, exposed places (as defined by the [Selected Characteristics of Occupations ("SCO")]).  She can perform work that does not require the operation of a motor vehicle or heavy equipment.  She can perform simple, routine work (i.e., requires little or no judgment, requires little specific vocational preparation and can be learned on the job within 30 days, does not provide work skills and has no more than occasional changes in core work duties).  She can have frequent contact with the general public, coworkers, and supervisors.

. . .

5.   [Plaintiff] has no past relevant work.

. . .

9.   Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . .

10.  [Plaintiff] has not been under a disability, as defined in the [Act], since September 26, 2013, the date the application was filed.

(Tr. 13-29 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

## A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a

refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id.

(quoting 42 U.S.C. § 423(d)(1)(A)).[2] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[3] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is

---

[2] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[3] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work

---

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

experience) to adjust to a new job." Hall, 658 F.2d at 264-65.

If, at this step, the Commissioner cannot carry its "evidentiary

burden of proving that [the claimant] remains able to work other

jobs available in the community," the claimant qualifies as

disabled. Hines, 453 F.3d at 567.[5]

## B. Assignments of Error

Plaintiff argues that the Court should overturn the ALJ's

finding of no disability on these grounds:

1) the ALJ "erred in failing to give more weight to

[consultative psychological examiner] Dr. [Joseph P.] Ap[p]ollo's

opinion without sufficiently explaining [the ALJ's] rationale"

(Docket Entry 12 at 4 (underscoring omitted));

2) "[t]he ALJ erred in failing to include time off-task or

absenteeism in his RFC finding and in using improper evidence and

rationale for finding that Plaintiff would be able to be present

and on-task as required by competitive employment" (id. at 7

(underscoring omitted)); and

3) the ALJ "erred in failing to find that [Plaintiff's]

fibromyalgia is a severe impairment" (id. at 11 (underscoring

omitted)).

_____

[5] A claimant thus can establish disability via two paths through the SEP. The
first path requires resolution of the questions at steps one, two, and three in
the claimant's favor, whereas, on the second path, the claimant must prevail at
steps one, two, four, and five. Some short-hand judicial characterizations of
the SEP appear to gloss over the fact that an adverse finding against a claimant
on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at
35 ("If the ALJ finds that a claimant has not satisfied any step of the process,
review does not proceed to the next step.").

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (Docket Entry 14 at 12-23.)

## 1. Dr. Appollo's Opinions

In Plaintiff's first issue on review, she asserts that the ALJ "erred in failing to give more weight to Dr. Ap[p]ollo's opinion without sufficiently explaining [the ALJ's] rationale." (Docket Entry 12 at 4 (underscoring omitted).) In particular, Plaintiff argues that "[t]he ALJ . . . declined to give Dr. Ap[p]ollo's opinion significant weight[, but t]he only rationale [the ALJ] provided for th[at] weight was that 'it appear[ed] [Dr. Appollo] relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff], seeming to accept uncritically as true, most, if not all, of what [Plaintiff] reported.'" (Id. at 5 (quoting Tr. 25).) According to Plaintiff, "the ALJ completely failed to acknowledge the numerous observations and significant objective testing" reflected in Dr. Appollo's report. (Id. at 6 (referencing Tr. 770-79).) Plaintiff further maintains that "[a] marked limitation in one's ability to properly respond appropriately [sic] to usual workplace situations and changes in a routine work setting [as found by Dr. Appollo] is not consistent with competitive work activity[ and ] would prevent an individual from being able to stay on task and attend work in a full-time setting." (Id. (referencing Tr. 772).) Plaintiff's contentions fall short.

Consultative examiners like Dr. Appollo do not constitute treating sources under the regulations, see 20 C.F.R. § 416.927(c)(2), and thus their opinions, as a general proposition, do not warrant controlling weight, Turberville v. Colvin, No. 1:11CV262, 2014 WL 1671582, at *6 (M.D.N.C. Apr. 23, 2014) (unpublished), recommendation adopted, slip op. (M.D.N.C. May 15, 2014) (Eagles, J.). However, the ALJ must nevertheless evaluate consultative opinions using the factors outlined in the regulations, and expressly indicate and explain the weight he or she affords to such opinions. See 20 C.F.R. § 416.927(c) ("Regardless of its source, [the ALJ] will evaluate every medical opinion [he or she] receive[s]" and, where an opinion does not warrant controlling weight, the ALJ must "consider all of the . . . factors [in 20 C.F.R. § 416.927(c)(1)-(6)] in deciding the weight [to] give to any medical opinion." (emphasis added)); Social Security Ruling 96-5p, Medical Source Opinions on Issues Reserved to the Commissioner, 1996 WL 374183, at *5 (July 2, 1996) ("SSR 96-5p") (noting that ALJs "must weigh medical source statements . . . [and] provid[e] appropriate explanations for accepting or rejecting such opinions" (emphasis added)).

On October 6, 2016, Dr. Appollo conducted a consultative psychological examination ("CPE") of Plaintiff (Tr. 774-79), reporting Plaintiff's diagnosis as "[m]ajor [d]epressive [d]isorder, severe, recurrent" (Tr. 779 (bold font omitted)).

Plaintiff's performance on the Wechsler Adult Intelligence Scale IV ("WAIS-IV") reflected processing speed in the average range, all other composite scores in the low average range, and a full scale IQ of 80. (See Tr. 777-78.) Dr. Appollo noted that Plaintiff "was pleasant and responsive" and that her "[m]ood and affect were stable but depressed and tearful." (Tr. 777.) Ultimately, Dr. Appollo concluded that Plaintiff possessed "[l]ow [a]verage ability to understand, retain and follow instructions" and "to sustain attention to perform simple repetitive tasks" but "would have significant problems in the ability to tolerate stress and pressure associated with day to day work activity." (Tr. 779.) Dr. Appollo also completed a "Medical Source Statement of Ability to Do Work-Related Activities (Mental) [('MSS')]," on which he opined that Plaintiff had mild restriction of her ability to understand, remember, and carry out both simple and complex instructions and of her ability to make judgments on both simple and complex work-related decisions (Tr. 770), moderate restriction on her ability to interact with the public, supervisors, and co-workers (Tr. 772), and marked restriction on her ability to "[r]espond appropriately to usual work situations and to changes in a routine work setting" (id.).

The ALJ discussed Dr. Appollo's opinions from the CPE and MSS and then weighed them as follows:

> Dr. Appollo's opinions can be given some weight because they were based at least in part on the objective testing

that he administered. However, he did not indicate that
he had reviewed the medical evidence of record and it
appears that he relied quite heavily on the subjective
report of symptoms and limitations provided by
[Plaintiff], seeming to uncritically accept as true most,
if not all, of what [Plaintiff] reported. Yet, as
explained elsewhere in th[e ALJ's] decision, there exist
good reasons for questioning the reliability of
[Plaintiff's] subjective complaints.

(Tr. 25 (internal citation omitted).) The ALJ's above-described
analysis demonstrates that Plaintiff's arguments fail for three
reasons.

First, the record contradicts Plaintiff's assertion that "the
ALJ <u>completely failed</u> to acknowledge the numerous observations and
significant objective testing" reflected in Dr. Appollo's report
(Docket Entry 12 at 6 (emphasis added)). The ALJ observed that Dr.
Appollo "not[ed] that [Plaintiff's] WAIS-IV full scale IQ was 80,
consistent with low average intellectual ability," that Plaintiff
"was pleasant and responsive," that "her thought processes were
relevant and coherent," and that "her mood-affect was depressed and
tearful." (Tr. 14 (citing Tr. 774-80).) Moreover, the ALJ
expressly accorded Dr. Appollo's opinions "some weight <u>because they
were based at least in part on the objective testing that he
administered</u>" (Tr. 25 (emphasis added)), which clearly indicates
that the ALJ both acknowledged and credited (to some degree) the
objective testing in Dr. Appollo's report.

Second, the ALJ did not err by finding that Dr. Appollo relied
heavily on Plaintiff's subjective symptom reporting. In that

regard, the ALJ observed that Dr. Appollo's CPE and MSS failed to reflect "that he had reviewed the medical evidence of record" (Tr. 25).  Moreover, a comparison of Plaintiff's subjective symptom reporting during the examination, with Dr. Appollo's conclusions on the CPE and MSS, supports the ALJ's observation that Dr. Appollo based his opinions, in large part, on Plaintiff's subjective statements.  For example, Plaintiff reported to Dr. Appollo that she "[f]eels sad and depressed most days" with a "[l]oss of energy and motivation," and that she had "been on antidepressants in the past." (Tr. 775 (emphasis added).)  In comparison, Dr. Appollo noted as support for his more significant restrictions on the MSS that Plaintiff "continues to feel depressed" and "complains of a loss of energy and motivation."  (Tr. 772 (emphasis added).)  Dr. Appollo also included on the CPE, as an explanation for his opinion that Plaintiff would have significant problems tolerating work stress and pressure, that Plaintiff "continues to feel depressed" and had not "been able to find an antidepressant that [wa]s helpful."  (Tr. 779 (emphasis added).)  Given the lack of documentation that Dr. Appollo reviewed any record medical evidence and the similarity between Plaintiff's subjective symptom reporting and Dr. Appollo's conclusions, the ALJ did not err by discounting Dr. Appollo's opinions as based heavily on Plaintiff's subjective complaints.

Third, Plaintiff erroneously asserts that "[t]he only rationale [the ALJ] provided for [according Dr. Appollo's opinion some] weight was that 'it appear[ed] [Dr. Appollo] relied quite heavily on the subjective report of symptoms and limitations provided by [Plaintiff]'" (Docket Entry 12 at 5 (quoting Tr. 25) (emphasis added)). In fact, the ALJ further found that, "as explained elsewhere in th[e ALJ's] decision, there exist good reasons for questioning the reliability of [Plaintiff's] subjective complaints." (Tr. 25.) Consistent with that statement, earlier in the decision, the ALJ detailed the reasons supporting his finding that Plaintiff's "allegations as to the intensity, persistence and limiting effects of [her] symptoms [we]re disproportionate [to] and not consistent with the corroborating evidence" (Tr. 20). (See Tr. 20-21.) Notably, Plaintiff did not challenge the ALJ's evaluation of Plaintiff's subjective symptom reporting. (See Docket Entry 12.) Thus, the ALJ based his assignment of only some weight to Dr. Appollo's opinion not only on the fact that it relied heavily on Plaintiff's subjective symptom reporting, but also on the fact (not contested by Plaintiff) that her symptom reporting lacked consistency with the evidence of record.

Plaintiff additionally argues that "[a] marked limitation in one's ability to properly respond appropriately [sic] to usual workplace situations and changes in a routine work setting [as found by Dr. Appollo on the MSS] is not consistent with competitive

14

work activity[ and ] would prevent an individual from being able to stay on task and attend work in a full-time setting." (Docket Entry 12 at 6 (referencing Tr. 772).) However, the definition of "[m]arked" on the MSS itself belies Plaintiff's argument. (Tr. 770.) According to the MSS, a "[m]arked" restriction means "serious limitation" and "substantial loss in the ability to effectively function," whereas the MSS defines an "[e]xtreme" restriction as "major limitation" and "<u>no</u> useful ability to function." (<u>Id.</u> (emphasis added).) Moreover, the ALJ expressly credited Dr. Appollo's opinion that Plaintiff suffered marked restriction of her ability to respond appropriately to workplace situations and changes by finding that Plaintiff had marked limitation in her ability to adapt and manage herself at step three of the SEP (<u>see</u> Tr. 17); however, because meeting the requirements of Listing 12.04 ("[d]epressive, bipolar and related disorders") requires <u>two</u> marked ratings (or one extreme rating) in the four areas of mental functioning, <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04, the ALJ properly found that the marked rating in adapting and managing oneself did not equate to a finding of disability (<u>see</u> Tr. 17 ("Because [Plaintiff's] mental impairment d[id] not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria [of Listing 12.04] are not satisfied.")).

In sum, Plaintiff has not established reversible error with respect to the ALJ's evaluation of Dr. Appollo's opinions.

## 2. Time Off-Task and Absenteeism

Next, Plaintiff challenges the ALJ's "fail[ure] to include time off-task or absenteeism in his RFC finding" and his "us[e of] improper evidence and rationale for finding that Plaintiff would be able to be present and on-task as required by competitive employment." (Docket Entry 12 at 7 (underscoring omitted).) More specifically, Plaintiff faults the ALJ for "us[ing] his own self-developed range [of acceptable time off-task and absenteeism in competitive employment] based on testimony from other [VEs] in other hearings that [we]re not part of the record in this case." (Id. at 10 (referencing Tr. 29).) According to Plaintiff, "[b]ecause the ALJ acknowledged that [Plaintiff] would be off-task in a work setting, yet failed to include specific limitations regarding her time off-task in [the] RFC finding," the Court "cannot tell whether [Plaintiff's time off-task] would truly be in line with the 10[ percent acceptable time off-task] as noted by the VE testifying at the hearing, or with the [zero to five percent] range [of acceptable time off-task also] noted in the ALJ's [decision]." (Id. (referencing Tr. 29).) Those contentions do not warrant relief.

After adopting the VE's testimony regarding three jobs available in significant numbers in the national economy that

Plaintiff could perform (<u>see</u> Tr. 28; <u>see also</u> Tr. 98-100, 341-43),
the ALJ provided the following discussion regarding time off-task
and absenteeism:

> The [VE] opined that a minimum of 90[ percent]
> productivity in an [eight]-hour workday, not including
> the typical morning, lunch, and afternoon breaks[,] is
> required to sustain unskilled competitive employment.
> The [VE] also opined that a person could miss up to [one]
> workday a month and still maintain competitive
> employment.
>
> Minimal productivity and missed workdays varies from [VE]
> to [VE] because neither the [<u>Dictionary of Occupational
> Titles</u> ("<u>DOT</u>")] nor the [<u>SCO</u>] addresses the issue.  Any
> [VE's] opinion on these issues is based on that [VE's]
> education, professional experience in placing individuals
> in work, study of work surveys and other vocational
> literature, and vocational conference attendance.
>
> The [ALJ] was appointed an [ALJ] in August 2010 and has
> taken testimony from [VEs] situated from Maine to
> Florida, from the East Coast to California.  That
> testimony has included a range of 80 [percent] to, in a
> single instance 100[ percent] as the minimum productivity
> required to sustain competitive employment.  The majority
> of the [VEs] have opined that 90 to 95[ percent] is the
> minimum.  [VE] testimony on toleration of missed workdays
> varies widely, but averages [one] to [one and a half]
> workdays a month.  Collectively, [VE] testimony shows
> that 100[ percent] productivity and perfect attendance is
> not required to engage in and maintain unskilled
> competitive employment.
>
> Because it would be speculative, the [ALJ] declines to
> find with specificity the extent to which [Plaintiff's]
> productivity capacity is reduced by her physical and
> mental impairments and pain, or how many workdays a month
> [Plaintiff] would miss.  The [ALJ] does not find that the
> record supports the conclusion that the impairments'
> symptoms cause exceptional functional limitations that
> result in less than the average ranges discussed above.

(Tr. 28-29.)

Although Plaintiff argues that the ALJ erred by "failing to include time off-task or absenteeism in his RFC finding" (Docket Entry 12 at 7 (underscoring omitted)), Plaintiff did not pinpoint any record evidence supporting such restrictions (see id. at 7-11). In contrast, the ALJ provided substantial evidence to support his conclusion that Plaintiff did not require greater time off-task and absences from work than the tolerances of competitive employment. At step three, the ALJ found that Plaintiff suffered only mild deficit in her ability to concentrate, persist, or maintain pace (a finding that Plaintiff did not challenge (see Docket Entry 12)), noting that Plaintiff's "unsupervised activities of daily living consume a substantial part of her day, and they are no more than 'mildly' affected by her mental impairment." (Tr. 17.) The ALJ also observed that "[f]urther [mental] limitations [we]re not supported due to the lack of mental health therapy notes or other relevant objective medical evidence." (Tr. 27.) Simply put, Plaintiff has not shown that the record compelled the ALJ to adopt time off-task and absenteeism limits beyond those tolerated in unskilled, competitive employment.

Furthermore, the ALJ did not err by considering (and discussing) the range of VE testimony regarding acceptable time off-task and absenteeism that the ALJ had heard since his appointment as an ALJ in 2010. (See Tr. 29.) "[B]efore relying on VE . . . evidence to support a disability . . . decision, [ALJs]

must[ i]dentify and obtain a <u>reasonable explanation</u> for any conflicts between occupational evidence provided by VEs . . . and information in the [<u>DOT</u>], . . . and [e]xplain in the . . . decision how any conflict that has been identified was resolved." Security Ruling 00-4p, <u>Policy Interpretation Ruling: Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions</u>, 2000 WL 1898704, at *1 (Dec. 4, 2000) ("SSR 00-4p") (emphasis added). Here, because the <u>DOT</u> does not address time off-task or absenteeism (which the ALJ expressly acknowledged (<u>see</u> Tr. 29)), the ALJ 1) properly solicited VE testimony on those subjects (<u>see</u> Tr. 100), and 2) fulfilled the duty imposed by SSR 00-4p to ensure that the VE's explanation qualified as reasonable by comparing the VE's testimony in this case with testimony from other VEs regarding allowable time off-task and absenteeism (<u>see</u> Tr. 29). The ALJ ultimately concluded that 90 to 95 percent on-task (or five to ten percent off-task) and one to one and a half absences per month constituted the average limits of time off-task and absenteeism permitted in unskilled, competitive employment. (<u>Id.</u>) The VE's testimony in this case that unskilled, competitive work allows for "90 percent productivity" (or ten percent off-task) and one absence per month (<u>see</u> Tr. 100) falls within the average range found by the ALJ for such matters (<u>see</u> Tr. 29). The ALJ thus did not err (and certainly not in a manner that prejudiced Plaintiff) by discussing

the testimony of other VEs on the subjects of permissible time off-task and absenteeism.

Simply put, Plaintiff's second issue on review falls short as a matter of law.

### 3. Fibromyalgia

Lastly, Plaintiff faults the ALJ for "failing to find that [Plaintiff's] fibromyalgia is a severe impairment." (Docket Entry 12 at 11 (underscoring omitted).) According to Plaintiff, "the record contains clear evidence to support the rheumatologist's (Laura Black, M.D.) diagnosis of fibromyalgia syndrome" (id.), because "substantial evidence of record supports that a diagnosis of fibromyalgia is established under Social Security Ruling 12-2p[, Titles II and XVI: Evaluation of Fibromyalgia, 2012 WL 3104869 (July 25, 2012) ("SSR 12-2p")]" (id. at 12).[6] Those assertions ultimately miss the mark.

The Court need resolve neither the complex question of whether Plaintiff's fibromyalgia qualified as a medically determinable impairment under SSR 12-2p, nor the related inquiry of whether her fibromyalgia constituted a severe impairment. Even if the ALJ erred by not deeming Plaintiff's fibromyalgia a medically determinable impairment and/or a severe impairment (see Tr. 15-16), any such error remains harmless under the circumstances presented

---

[6] The website for the Hunter-Hopkins Center, P.A. reflects that Dr. Black obtained board certification in "Family Practice" and not rheumatology. See https://drlapp.com/staff/ (last visited Aug. 16, 2019).

here, see Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). The ALJ limited Plaintiff to light work involving only four hours of standing and/or walking, goal-based work, no climbing of ladders, ropes, or scaffolds, occasional balancing and stooping, occasional exposure to hazards, and no operation of motor vehicles or heavy equipment to accommodate her symptoms of fatigue, lethargy, and dizziness. (See Tr. 18, 26.) Notably, Plaintiff merely claimed that "additional limitations arising from the diagnosis of fibromyalgia further erodes [sic] [Plaintiff's] RFC" (Docket Entry 12 at 12), and made no effort to explain what additional limitations the ALJ should have included on account of Plaintiff's fibromyalgia, beyond the significant limitations already contained in the RFC. That failure precludes relief. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); Hughes v. B/E Aerospace, Inc., No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) (unpublished) (Schroeder, J.) ("A party should not expect a court to do the work that it elected not to do."); Nickelson v. Astrue, No. 1:07CV783, 2009 WL 2243626, at *2 n.1 (M.D.N.C. July 27, 2009)

(unpublished) (Dixon, M.J.) ("[A]s [the plaintiff] failed to develop these arguments in his [b]rief, the [C]ourt will not address them."), recommendation adopted, slip op. (M.D.N.C. Sept. 21, 2009) (Schroeder, J.).

In light of the foregoing analysis, Plaintiff's final assignment of error does not justify reversal or remand.

## II. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 11) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) be granted, and that this action be dismissed with prejudice.


                          /s/ L. Patrick Auld
                        **L. Patrick Auld**
                **United States Magistrate Judge**

August 21, 2019